UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
In re:

                                       Case No. 06-41449-608

MARCO ANTONIO CHAVEZ,          Chapter 13




                  Debtor.

--------------------------------------------------------------------x




<u>DECISION</u>




APPEARANCES:

    Norma E. Ortiz                       Carla Duncan
    Ortiz & Ortiz, LLP               395 Livonia Avenue
    127 Livingston Street           Apartment 7H
    Brooklyn, New York 11201     Brooklyn, New York 11212
    Attorney for Debtor            Pro-Se Claimant

    Dolly Caraballo
    Caraballo & Mandell, LLC
    30 East 40th Street
    Suite 3100
    New York, New York 10016
    Attorney for Debtor




CARLA E. CRAIG
Chief United States Bankruptcy Judge

1

This matter comes before the Court on the motion ("Motion") of the debtor, Marco
Antonio Chavez (the "debtor" or "Mr. Chavez") to estimate proof of claim No. 6 under 11
U.S.C. § 502(c) at one dollar, representing nominal damages to pro se claimant Carla Duncan
(the "claimant" or "Ms. Duncan").  For the reasons set forth below, Ms. Duncan's claim, which
arose from her wrongful eviction by the debtor from her apartment, is estimated at $28,916.04
representing compensatory and punitive damages, including $4,416.04, representing
prejudgment interest at the rate of 9% per annum provided by C.P.L.R. §§ 5001(b).

<u>Jurisdiction</u>

This Court has jurisdiction over this matter under 28  U.S.C. §§ 1334(b) and the Eastern
District of New York standing order of reference dated August 28, 1986. The estimation process
under 11 U.S.C. § 502(c) is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  See <u>In re</u>
<u>Chateaugay Corp</u>., 111 B.R. 67, 72 (Bankr. S.D.N.Y. 1990). This decision constitutes the Court's
findings of fact and conclusions of law to the extent required by Fed. R. Bank. P. 7052.

<u>Factual Background</u>

The following is a summary of portions of the relevant testimony given by the claimant
at a two-day evidentiary hearing:[1]

In December 2003, the debtor rented Ms. Duncan a basement apartment (the
"Apartment") in a building he owned located at 2093 Dean Street, Brooklyn, New York, for
$1,400 per month, and during the relevant period she paid the rent each month in cash. (Tr. 2,
118:23-24.)  Ms. Duncan resided in the Apartment with her boyfriend and her minor daughter.

---

[1]References to "Tr. 1" are to the transcript of the hearing held on November 1, 2007 and references to "Tr. 2" are to
the transcript of the hearing held on November 16, 2007.

In March 2004, Ms. Duncan notified the debtor that her stove was not working and asked the debtor to fix it. (Tr. 2, 131:13-14.)  In response, the debtor left a note in the Apartment saying that he "came by to fix [the] stove," but could not get it to work, and that he would contact a mechanic to repair it.  (Tr. 1, 53:3-5; Tr. 2, 131:15-16.)  At the end of April, the stove had not been repaired, so Ms. Duncan informed the debtor that she was going to call 311 to attempt to arrange to have the stove fixed. (Tr. 2, 132:2-4.)  Ms. Duncan testified that she and the debtor were subsequently notified that the City was investigating whether Mr. Chavez was renting Ms. Duncan an illegal basement apartment.[2]  (Tr. 2, 135:2; 13-14.)  On May 5, 2004, the debtor entered the Apartment and demanded that Ms. Duncan leave, and an argument ensued. (Tr. 2, 143:19-22.)  The debtor then, according to Ms. Duncan, locked himself in the Apartment's bathroom and flushed an entire roll of toilet paper down the toilet. (Tr. 2, at 146:17-20.)

On May 8, 2004, the Apartment flooded, except for the kitchen, the bathroom, and the master bedroom. (Tr. 2,  150:13-14.)  Ms. Duncan contends that the debtor caused the flood by clogging the plumbing system in order to force her to vacate when he learned of the investigation of the illegal occupancy of a basement apartment at the premises. (Tr. 1, 138:17-19; Tr. 2, 135:12-15; 146:9-20; 147:9-10; 161:6-8.)  With the help of neighbors, Ms. Duncan loaded as many of her belongings as she could from the flooded Apartment into garbage bags, and contacted Rent-A-Center, from which she had rented the furniture in the Apartment, notifying them of the flood and requesting that they remove the furniture. (Tr. 2, 148:12-14;

---

[2]Under the Multiple Dwelling Law and the Administrative Code of the City of New York, a basement may be occupied for living purposes only if the building meets certain requirements, and a written permit is issued for residential occupancy of the basement.  If a basement is used as a dwelling in violation of the law, no rent may be collected, and the owner may be subject to civil and criminal penalties.  See Multiple Dwelling Law § 301; Administrative Code § 27-217; Gigante v. Danilova, 188 Misc. 2d 240; 727 N.Y.S.2d 861; 2001 N.Y. Misc. LEXIS 158 (Civ. Ct., Bronx Co. 2001).

157:19-21; 158:1-6.)  Though she was able to remove some of her personal property, Ms.

Duncan testified that she left much of her property in the Apartment, including, among other

things, clothing, toys, food, a laptop, kitchen appliances, and $5,000 in cash she kept hidden in a

locked closet. (Tr. 2, 166:15-17; 167:15; 168:3-5.)  After the flood, Ms. Duncan and her

daughter stayed for several days with a neighbor, because the Apartment was uninhabitable.  (Tr.

2, 155:22-24; 157:1-10.)

On May 11, Ms. Duncan returned to the Apartment and discovered that the debtor had

nailed shut the door to the Apartment. (Tr. 2, 154:2-5; 155:6-9; 158:11-12.)  On May 12, Ms.

Duncan obtained an order restoring her to possession of the Apartment from the New York

County Civil Court, in which Judge Dawn M. Jimenez awarded Ms. Duncan a final judgment of

possession ("Order of Possession") based on testimony she provided that established an illegal

lock-out by Mr. Chavez. (Order, May 12, 2004.)  Judge Jimenez sent an officer of the court

("Officer Boyette") to the Apartment to ensure the Order of Possession was complied with. (Tr.

2, 152:19-22)  Upon entering the Apartment with Officer Boyette, Ms. Duncan found her

belongings strewn about, mixed with trash in standing water. (Tr. 2, 14:6-7.)  The kitchen

cabinets were broken and partially removed, and the refrigerator was gone, later to be discovered

in the shed with other kitchen appliances and the toilet. (Tr. 2, 14:5-6; 38:1-3; 166:24-25.)  "My

whole house was destroyed; food, clothes, toys, our dishes, you name it, pots, pans, everything

[was] destroyed." (Tr. 2, 166:15-20.)  Ms. Duncan testified that her property that remained in the

Apartment was removed by the debtor, and that she never recovered it.  Ms. Duncan testified

that she has suffered emotionally as a result of the debtor's actions and losing her possessions

and home, and that she has been diagnosed with bi-polar disorder which was exacerbated by

these events. (Tr. 2, 196:8-12; 202:13-17.)

Procedural Background

On May 13, 2004, Ms. Duncan commenced a pre-petition action against the debtor in the New York City Civil Court, Kings County (the "Civil Court Action"), for damages sustained as a result of the alleged unlawful eviction.  (Motion, 1.)  On May 9, 2006, Mr. Chavez filed a voluntary petition under Chapter 13 of the U.S. Bankruptcy Code, thereby staying the Civil Court Action under § 362(a) of the Bankruptcy Code. (Id. at 1.)  Ms. Duncan timely filed a proof of claim on  June 15, 2006 (the "Claim") in the amount of $228,000, representing her claimed damages in the Civil Court Action. (Proof of Claim No. 6.)  The debtor filed an objection to the Claim ("Objection"), requesting that the Claim be expunged.  (Objection, 1.)  Based on the record established at the October 18, 2006 hearing on the Objection, the Court denied the Objection and modified the automatic stay to permit the Civil Court Action to proceed to judgment, but not execution.  (Order Lifting Stay, Oct. 27, 2006.)  By decision and order dated April 19, 2007, Judge Kenneth B. Sherman directed that the case be transferred to the Supreme Court of New York on grounds that it exceeded the monetary jurisdictional limit of the Civil Court.  By motion dated August 9, 2007, the debtor requested that the Bankruptcy Court estimate the Claim in order to avoid further delay in seeking confirmation of his Chapter 13 plan. (Motion, 1.)  The Court granted the debtor's motion.  (Order dated October 12, 2007.)  An evidentiary hearing to estimate Ms. Duncan's claim was held on November 1, 2007, and concluded on November 16, 2007.

Legal Standard

The debtor's motion to estimate the Claim is governed by § 502(c) of the Bankruptcy

Code, which provides:

> (c) There shall be estimated for purpose of allowance under this
> section –
>
>> (1) any contingent or unliquidated claim, the fixing or
>> liquidation of which, as the case may be, would unduly
>> delay  the administration of the case;

11 U.S.C. § 502(c) (emphasis added).

Bankruptcy courts are required to estimate claims "[t]o achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings." In re Adelphia Business Solutions, Inc., 341 B.R. 415, 423 (S.D.N.Y. 2003)(citation omitted); "[W]hen the liquidation of a claim is premised on litigation pending in a non-bankruptcy court, and the final outcome of the matter is not forthcoming, the bankruptcy court should estimate the claim." In re Lionel L.L.C., Case No. 04-17324, 2007 Bankr. LEXIS 2652, at *7 (S.D.N.Y. August 3, 2007) (citation omitted).

Ms. Duncan's action for damages has already continued for several years in the Civil Court, only to be transferred to the Supreme Court for further litigation. It is clearly within this Court's authority to estimate Ms. Duncan's claim to avoid further delay in the administration of the debtor's bankruptcy case.

"Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure provide any procedures or guidelines for estimation." DeGeorge Financial Corp. v. Novak (In re DeGeorge Financial Corp.), Case No. 3:01CV0009(CFD), 2002 U.S. Dist. LEXIS 17621, at *34 (D. Conn. July 15, 2002). Courts addressing the issue have held that bankruptcy judges may use "whatever method is best suited to the particular contingencies at issue." Id. (quoting Bittner v.

Borne Chemical Co., 691 F.2d 134, 135 (3d Cir. 1982). "The methods used by courts have run the gamut from summary trials to full-blown evidentiary hearings to a mere review of pleadings [and] briefs." Id. at *35 (citations omitted). In exercising this broad discretion, the "[c]ourt must apply 'the legal rules which govern the ultimate value of the claim,' which ordinarily requires the application of state law." In re Enron Corp., Case No. 01-16304, 2006 Bankr. LEXIS 4294, at *10 (S.D.N.Y. January 17, 2006) (quoting In re Brints Cotton Marketing,Inc., 737 F.2d 1338, 1341 (5th Cir. 1984)). "In general, the truncated trial process that can be developed under 502(c) has been found to be consistent with the dictates of due process of law." Lionel, 2007 Bankr. LEXIS 2652, at *16-17 (citations omitted).

## Wrongful Eviction

The debtor testified that he locked Ms. Duncan out of the Apartment because he believed that she had voluntarily moved out. The Court finds that the debtor's account lacks credibility for many reasons.

For one thing, the debtor failed even once to mention, let alone to explain, the flood and resulting water damage in the Apartment, although Ms. Duncan introduced numerous photographs into evidence showing that it had occurred. (Claimant's Exhibits 2-A, 2-K, 2-M, 2-N and 25.) Ms. Duncan also introduced Officer Boyette's testimony that the kitchen was dismantled, and the cabinets removed, and introduced additional photographs showing that closet doors were broken and removed from their hinges. The condition of the Apartment described by Mr. Boyette and shown in the photographs is consistent with the explanation offered by Ms. Duncan for the debtor's actions – that he locked her out because he knew that he had rented her an illegal basement apartment and that the authorities were investigating this as a

result of her complaint, and he wanted to get rid of the evidence that the basement was being used as an apartment.  (Tr. 2, 14:5-6; 38:1-3; Claimant's Exhibits 3-A, 3-F.)

The debtor's omission of any mention of the flood and damage to the Apartment from his testimony adds credibility to Ms. Duncan's version of events.  The debtor's failure to offer any alternative explanation why the Apartment was flooded and the kitchen cabinetry and appliances removed is difficult to understand and undermines the credibility of his testimony.  (Tr. 2, 14:5-6; 38:2.)  In fact, the debtor's entire story lacked credibility.  His testimony was peppered with omissions, obvious falsehoods, and inconsistencies.  The debtor's only supporting evidence was provided by his brother, Enrique Chavez, whose testimony was equally lacking in credibility.

For example, the debtor and his brother testified that they resided in the Apartment with Ms. Duncan and her daughter, and that Ms. Duncan and her daughter were guests and were never asked to pay any rent in exchange for living there. (Tr. 2, 29:11-13; 24:12-13; 93:2-8.) This distinction is not relevant to Ms. Duncan's claim for wrongful eviction; even the landlord of a squatter may not resort to self-help "[w]hen a landlord gives permission, whether implicit or express, to occupy his property." Walls v. Giuliani, 916 F. Supp. 214, 218 (E.D.N.Y. 1996). Apparently, however, the debtor believes that Ms. Duncan's status as a rent-paying tenant is relevant to whether it was legal for the Apartment to be used by her as a dwelling.  Mr. Chavez states in his Declaration dated July 16, 2006, submitted in connection with the Debtor's Objection to Proof of Claim Number Six,[3] that "[t]he basement does not contain a legal apartment or dwelling space, so it could not be rented to her, but it was habitable.  I never

---

[3] Docket Entry No. 7.

requested any money from Ms. Duncan because of her relationship with my brother."
(Declaration dated 7/10/06, ¶ 2.)  The fact that the debtor concocted this patently incredible story
of a communal living arrangement in the Apartment adds credibility to Ms. Duncan's
explanation of events: there would be no reason for the debtor to fabricate such a story unless he
was concerned about liability for renting an illegal basement apartment.

In their testimony, the debtor and his brother repeatedly displayed a lack of credibility.
For example, the accounts they gave regarding the simple matter of the number of bedrooms in
the Apartment and who slept where in the Apartment were not remotely consistent.  The debtor
testified that he "[h]ad one room, [Ms. Duncan] and my brother had the other room, and the
other room was for [Ms. Duncan's] daughter." (Tr. 1, 79:2-3.)  The debtor's brother described
the Apartment as having two bedrooms, not three (Tr. 1, 93:24).   He testified that "Carla and her
daughter stayed in one room and when her daughter was sleeping I would go into the room with
her or Marco would stay in the other room."  (Tr. 1, 96:12-14.)

The debtor's testimony about his occupancy of the Apartment was also internally
inconsistent.  In just minutes of testimony concerning where exactly he resided, the debtor
managed to contradict himself several times.  The Court made the following inquiry, after the
debtor testified that he went into the apartment to verify information he received from his other
tenants, that Ms. Duncan had moved out (Tr. 1, 25:23-25; 26:1-5):

> The Court:     So you were living in this apartment with her and - - she
> didn't tell you when she was moving out?  Were you
> living in this apartment with her at the time?
>
> The Witness:   *At the time I wasn't living with her* . . . We were in
> problems.

 (Tr. 1, 26:21-25 (emphasis added).)

In response to questions asked by his attorney, the debtor then testified to the contrary:

> Q.    So you all resided in the apartment . . . . *Were you staying in the apartment on a regular basis, sleeping there in April and May of 2004?*
>
> A.    Yes.
>
> Q.    On a regular day to day basis - -you slept [there]?
>
> A.    Yes.

(Tr. 1, 27:22-25; 28:1-5 (emphasis added).)

The Court then interjected:

> The Court:        I'm sorry.  I'm sorry.  I really have to clarify this.  You just testified that you were sleeping there on a regular basis in April and May.
>
> The Witness:     Mm hmm.
>
> The Court:        A minute ago you told me you were not.
>
> The Witness:     Well, what I said was that we were having some problems, so since we were having problems I wasn't there all the time, but I always had access to the apartment.
>
> The Court:        Well, what does that mean- -
>
> The Witness:     To the basement.  Excuse me.  To the basement.
>
> The Court:        What does that mean . . . . you were or you were not sleeping there?
>
> The Witness:     I had my own room which I went in and out of.
>
> The Court:        In the basement?

The Witness:  In the basement, which she had her room.

The Court:      [Y]ou were residing in that apartment with her?

The Witness:  Yes.

(Tr. 1, 28:16-25; 29:1-13.)

The debtor's lack of credibility became more evident on cross examination, when he was unable to square his actions with his story of residing with Ms. Duncan in the Apartment. The debtor testified that in March, after Ms. Duncan informed him that the oven was not working, he left a note in the Apartment stating that he "came by to fix the oven," but could not get it to work, and that he would contact a mechanic to repair the oven. (Tr. 1, 54:1-5)  Again, the Court requested clarification:

> The Court:      Mr. Chavez, if you were living in the apartment why were you leaving Ms. Duncan a note saying that you had "come by" to try to fix the stove?
>
> The Witness:  Because I was trying to let her know that I tried to fix the stove.
>
> The Court:      If you live in a place you don't talk about "coming by," do you?  It seems like an odd way to put it.
>
> The Witness:  It was - - I mean, we had an odd way of living together, yes, we did.

(Tr. 1, 55:21-25; 56:1-4.)

The debtor's lack of credibility, as well as his brother's, is further shown by the testimony that before the debtor changed the locks, the Apartment was completely vacant except for three bags filled with garbage.  When asked on direct examination how he knew the items in the Apartment were garbage, he stated that he looked in the bags and saw "[s]poiled

foods, you know, like when you clean up there was a lot of dust in there. I mean, I don't recall

what exactly it was, but I knew it was garbage." (Tr. 1, 31:6-9.)   Similarly, when the debtor's

brother was asked on direct examination how he knew that Ms. Duncan actually vacated the

Apartment, he testified that he knew she left because all of her belongings were gone and only

garbage bags, the refrigerator, and the stove remained.  (Tr. 1, 94:9-17.)

        This testimony of the debtor and his brother was refuted by Ms. Duncan and by Officer

Boyette, who was sent there in his official capacity by Judge Jimenez.  Officer Boyette testified

to seeing Ms. Duncan's belongings in the Apartment and testified that the debtor had other

items belonging to Ms. Duncan in his locked shed.  Officer Boyette also confirmed Ms.

Duncan's testimony that the Apartment was flooded and the kitchen dismantled.  He testified

that he went to the Apartment on May 13, 2004 and that when the debtor arrived, he let Officer

Boyette in. (Tr. 2, 2007, 13:10-12.)  According to Officer Boyette,  the Apartment was in

shambles.  He described the scene as follows:

> Q.    On May the 13th when you got to 2093 Dean Street . . . can you
>        tell me what you saw?
>
> A.    [M]r. Chavez opened  up the basement where the [A]partment
>        was, and I came inside.  The [A]partment was in total disarray.
>        The kitchen was destroyed.  Appliances were removed.  The rugs
>        were soaking wet and smelling of mildew  and mold because
>        water had been running.  It had been flooded.  There was a lot of
>        debris mixed with clothes, toys, shoes throughout the apartment,
>        spread throughout.  (Tr. 2, 13:12-17.)
>
> Q.    [C]an you describe to the court my [re]action?
>
> A.    Kind of hysterical . . . when she saw like the kitchen with the
>        cabinets being broken, all of her belongings thrown around and
>        mixed with  the water and the trash.  She was very upset,
>        extremely upset. (Tr. 2, 14:4-8.)

Q.      Please tell [the court] what happened that day?

A.      [S]omebody called 911 . . . .Officers persuaded Mr. Chavez to
open his shed in back of the house because she said all of her
property was missing . . . .When they opened up the shed behind
the house there was actually more of Ms. Duncan's property.  The
appliances were there.  There were bags with food from the
refrigerator, frozen food still partially frozen to show that it had
just recently been put in the shed, cereal, milk, things like that, a
lot  of snacks for her daughter I guess it was, clothes, documents
like her social security card and her wallet[.]  [T]hings like that
were all in the shed. (Tr. 2, 37:7-20.)

Officer Boyette also testified that at the direction of Judge Jimenez, he returned to the

Apartment on May 17, 2004 to ensure that progress was being made on restoring the Apartment

to a habitable condition in compliance with Judge Jimenez's order.  (Tr. 2, 41:15-18.)

Additionally, Officer Boyette stated that on his second visit to the premises, Ms. Duncan called

911 because the property belonging to her that Officer Boyette viewed in the shed on the first

visit was missing.  (Tr. 2, 42:3-5.)  Also missing was the stove, which Mr. Chavez replaced, in

an attempt to comply with Judge Jimenez's order restoring Ms. Duncan to possession.  (Tr. 2,

43:21; 44:5-7.)

Officer Boyette's testimony directly contradicted the debtor's, and was unbiased,

credible and uncontroverted.  Officer Boyette's testimony further undermined the debtor's

credibility, and added to the credibility of Ms. Duncan's version of events.  Based on Ms.

Duncan's and Officer Boyette's testimony, and based on the lack of credibility of the testimony

offered by the debtor, this Court finds that the debtor locked Ms. Duncan out of the Apartment

and removed and disposed of her property.

<u>Damages</u>

"One who enters upon lands by permission of the owner without any term being prescribed or without reservation of rent is a tenant at will and, as such, is entitled to one month's notice to quit." <u>Fisher v. Queens Park Realty Corp.</u>, 41 A.D.2d 547, 549; 339 N.Y.S.2d. 642, 645 (2d Dept. 1973); see also <u>Walls v. Giuliani</u>, 916 F. Supp. at 219 (A landlord may terminate a tenancy at will only by delivering written notice of at least 30 days demanding the tenant leave the premises). The debtor did not employ lawful process for evicting Ms. Duncan from the Apartment. The debtor had no right to lock Ms. Duncan out of the Apartment or to remove her possessions, and is therefore liable for any resulting damages.

<u>Compensatory Damages</u>

"The measure of compensatory damages for wrongful eviction is the value of the unexpired term of the lease over and above the rent the lessee must pay under its terms, together with any actual damages flowing directly from the wrongful eviction." <u>Long Isl. Airports Limousine Serv. Corp. V. Northwest Airlines</u>, 124 A.D.2d 711, 713; 508 N.Y.S.2d. 223, 225 (2d Dept. 1986). Damages measured by the value of the unexpired term of the lease would be inapplicable here, as Ms. Duncan was a tenant at will. However, Ms. Duncan may recover the value of her personal property lost, stolen or discarded during the course of the wrongful eviction.

The value of Ms. Duncan's personal property need not be determined to an exact certainty. "Receipts are not required to establish the value of [Ms. Duncan's] property; actual monetary loss, value of the property to the owner, [and] reasonable value . . . are all admissible to prove damages." <u>Foxworth v. Tjutjulis</u>, 4 Misc. 3d 133A; 791 N.Y.S. 2d 869; 2007 N.Y.

Misc. LEXIS 1061 (N.Y. Misc. 2d Dept. 2004) (some testimonial or other evidence is required

to establish the items lost and their estimated value); <u>N. Main Bagel Corp. v. Duncan</u>, 37 A.D.3d

785, 787; 831 N.Y.S.2d 239, 242; 2007 N.Y. App. Div. LEXIS 2323, 2007 (N.Y. App. Div. 2d

Dept. 2007) (holding that the Supreme Court erred in not granting the tenants the value of

personal property lost in the unlawful eviction based on a lack of documentation showing exact

prices paid, because there was credible testimony that the items were actually purchased and of

their estimated values, and no evidence was offered by the landlord to the contrary.)

Ms. Duncan testified that she valued the items lost from the Apartment at $25,000,

because that is the upper limit of damages available in Civil Court. (Tr. 2, 186: 11-12.)  That is

obviously not an appropriate method of valuing the items she lost.  Though she testified

generally that she lost food, clothes, toys, and household goods (Tr. 2, 166), Ms. Duncan was

unable to provide testimony identifying with any specificity the items she lost and their

approximate value. (Tr. 2, 183-196.)

Ms. Duncan did, however, specifically identify the value of several items of property she

lost as a result of the debtor's actions; she testified that she lost $5,000 in cash which she kept in

the Apartment (Tr. 2, 167:15), as well as a blender, for which she paid $200, and a microwave,

for which she paid $300 (Tr. 2, 189:3-4.)  Ms. Duncan's testimony on these points was credible.

Ms. Duncan testified that she did not have a bank account because she was a traveling surgical

technician and had recently gone through an acrimonious divorce.  (Tr. 2, 173:25; 174:1-3.)  She

stated that she would cash her pay checks weekly, and keep the money in the only closet in the

Apartment that had a lock. (Tr. 2, 167:15-18; 174:6-8.)   She further testified that she did not

think that the debtor necessarily stole the $5,000 she had in her closet at the time she was locked

out, but that he possibly threw it out along with the rest of her belongings.  (Tr. 2, 167:23-25;

168:1-4.)  In either event, the funds were lost as a result of the wrongful eviction, and the debtor

is liable.

It is clear from Ms. Duncan's testimony as well as Officer Boyette's that Ms. Duncan lost

other household goods, and although Ms. Duncan was unable to provide testimony concerning

the value of those items, this Court assigns a value of $1,000 for estimation purposes to the other

items of property lost by Ms. Duncan as a result of the debtor's actions.  Ms. Duncan's claim for

property damage is therefore estimated at $6,500.

Treble Damages

Section 853 of the New York Real Property Actions and Proceedings Law ("RPAPL")

provides in pertinent part:

> If a person is disseized, ejected, or put out of real property in a forcible
> or unlawful manner, or after he has been put out, is held and kept out by
> force or by putting him in fear of personal violence or by unlawful
> means, he is entitled to recover treble damages in an action therefor
> against the wrong-doer.

RPAPL § 853.

"Damages for the removal, destruction or discarding of property in the course of an

unlawful eviction are included under § 853." H & P Research, Inc. V. Liza Realty Corp., 943 F.

Supp. 328, 330 (S.D.N.Y. 1996).  The record supports the conclusion that the debtor put Ms.

Duncan out of the Apartment in an unlawful manner.  Ms. Duncan is therefore entitled to treble

damages, for a compensatory award of $19,500.

Punitive Damages

"An award for treble damages pursuant to RPAPL § 853 does not preclude an additional award of punitive damages." H & P Research, Inc., 943 F. Supp. at 330. Punitive damages is a common-law remedy which is "only available in the extreme cases where the [landlord] is shown to have been motivated by actual malice or to have acted in such a reckless, wanton or criminal manner so as to indicate a conscious disregard of the rights of others." Lyke v. Anderson, 147 A.D.2d 18, 31; 541 N.Y.S.2d. 817, 825-826 (2d Dept. 1989). The record supports a finding that the debtor acted with a complete disregard for Ms. Duncan's property, for her safety and that of her daughter, and for her legal rights. Suffolk Sports Center v. Belli Construction Corp., 212 A.D.2d 241, 248; 628 N.Y.S.2d. 952, 956 (2d Dept. 1995) (Punitive damages are appropriate when denying such damages "[c]ould be interpreted as tacit permission for a landlord to engage in threats and intimidation . . . conversely, the sanctioning of punitive damages will serve the public good by acting as [a] deterrent to similar actions in the future.") In this case, the record, including the debtor's patently incredible account of his living arrangements with Ms. Duncan, and his failure to offer any credible explanation of the circumstances under which he locked her out of the Apartment, or any account at all of the flooding of the Apartment and destruction of the kitchen, supports the conclusion that he acted in an attempt to force her out in order to cover up the fact that he had rented her an illegal apartment. As noted by the court in Pleasant East Associates:

> This case cries out for the imposition of punitive damages. Such a remedy should
> serve to deter the petitioner from repeating such conduct and serve as a warning
> to others.

Id. at 883-884 (citations omitted).

The measure of punitive damages must be proportionate to the amount of compensatory damages and to the nature of the landlord's conduct. In <u>Suffolk Sports Center</u>, 212 A.D.2d at 248, the court set aside the amount awarded for punitive damages, stating that although punitive damages were appropriate where a landlord "embarked upon a calculated effort to vitiate the landlord-tenant relationship between it and [its tenant]", the $300,000 awarded should be reduced to $60,000, which the court found to be proportionate to the $99,364.45 compensatory damages awarded. <u>Id.</u> This Court finds an award of $4,000 in estimated punitive damages satisfies the purpose and public policy set forth above in light of the debtor's conduct and that such an award is proportionate to the $6,500 awarded in estimated compensatory damages.

<u>Emotional Distress</u>

The emotional distress suffered by Ms. Duncan as a result of the trauma of losing her home and her belongings may be compensable damage. "The principle of awarding damages for emotional distress is not unknown in New York and the application of such principle to a case where a tenant is unceremoniously evicted from [her] home is entirely in accord with analogous decisions and 'civilized public policy'." <u>Williams v. Llorente</u>, 115 Misc. 2d 171, 173; 141 N.Y.S.2d 930, 932 (N.Y. App. Term 1982) (citations omitted) (quoting <u>Stiles v. Donovan</u>, 100 Misc. 2d 1048, 1050; 420 N.Y.S.2d 453, 455 (Civ. Ct. N.Y. Cty. 1979) (awarding $250 for emotional distress finding sufficient testimony given by the tenant regarding the emotional impact of being unlawfully locked out of his apartment and having his belongings removed.); <u>Lopez v. City of N.Y.</u>, 78 Misc. 2d 575, 577; 357 N.Y.S.2d 659, 661 (Civ. Ct. N.Y. Cty. 1974) (awarding $500 to the tenant for emotional distress where the landlord unlawfully and forcibly evicted the tenant and, destroyed and discarded his belongings.); <u>Bianchi v. Hood</u>, 128 A.D.2d 1007, 1008; 513 N.Y.S.2d. 541, 542 (3d Dept. 1987) (awarding $1,000 for pain and suffering

and mental distress based on the testimony of the tenant and her father, who verified the tenant's emotional distress and the aggravation to an ankle injury as a result of the "flagrant, unlawful interference by [the landlord] with [her] right to enjoy and possess her leased premises.")  The record here supports an estimated award of $1,000 in damages for emotional distress.  Ms. Duncan testified to the mental anguish she suffered because of the debtor's actions, as well as to her diagnosis of bipolar disorder and depression and the exacerbation of these problems as a result of the debtor's actions.  (Tr. 2, 196:10-12; 203:1-3.)

<u>Prejudgment Interest</u>

Ms. Duncan is entitled to recover prejudgment interest because of the debtor's interference with her "possession or enjoyment of property."  N.Y.C.P.L.R. §§ 5001(a); see also <u>N. Main Bagel</u>, 37 A.D.3 785 at 787 ("Prejudgment interest should be awarded on the plaintiff's recovery, from . . . the date of the wrongful eviction"). "Such interest is to be calculated at the simple rate of 9% per annum." <u>H & P Research, Inc.</u>, 943 F. Supp. at 332. Therefore, Ms. Duncan's estimated award shall be increased by $4,416.04, representing 9% interest or $6.04 per diem, from May 8, 2004 through May 9, 2006, the date this bankruptcy case was commenced.

### Conclusion

For the reasons stated in this opinion, this Court holds that proof of claim No. 6, filed by

Ms. Duncan, is estimated in the amount of $28,916.04, representing compensatory, treble and

punitive damages, including prejudgment interest of 9% per annum from May 8, 2004 through

May 9, 2006.  A separate order will be issued herewith.

Dated: Brooklyn, NY
          February 11, 2008


                                               */s/ Carla E. Craig*
                                               CARLA E. CRAIG
                                               Chief United States Bankruptcy Judge